**Carnahan Trust**

*John G. Frazer, Jr.*, for accountant.

*Lois G. Forer*, Deputy Attorney General, for Commonwealth.

BOYLE, P. J., April 11, 1962.—Where a trustee for charitable purposes agreed with testator in 1932, for compensation at the rate of two percent of the income of the trust, may the court allow the request of the trustee that its future compensation be increased to five percent of income beginning on March 3, 1961, for the reasons that the principal has increased greatly, the annual income of the trust has more than doubled since 1939, the duties and costs of administration have multiplied and the compensation of the trustee is inadequate to pay for the costs, expenses and services involved in the administration, management and maintenance of the trust?

This application is made at the audit of the first and partial account of Mellon National Bank and Trust Company, successor testamentary trustee to Union Trust Company of Pittsburgh. Notice of the filing of the account, the audit, and of the trustee's application for increased future compensation was given to the attorney general of Pennsylvania who has entered an appearance and filed a brief.

William E. Carnahan died March 1, 1939, leaving a last will and testament dated February 16, 1937,

and three codicils thereto dated June 13, 1937, May 21, 1938, and January 16, 1939.

Under paragraph 18 and subparagraph (a) thereto, testator provided as follows:

"EIGHTEENTH: All the rest, residue and remainder of my estate, real, personal and mixed, wheresoever situate, of which I may die seized or possessed or to which I may be entitled at the time of my decease, I give, devise and bequeath to THE UNION TRUST COMPANY OF PITTSBURGH, IN TRUST, NEVERTHELESS, for the following uses and purposes, to-wit:

"(a) To hold the three-fifths (3/5th's) part thereof, together with any additions which may from time to time be made thereto by the terms of this my Last Will and Testament; To collect the income arising therefrom and, less the expenses incident to the management of the trust and a reasonable compensation to the Trustee, to pay over the income, annually, to such charitable, religious or educational organizations or institutions in the United States, and in such manner and in such proportions, as my sister, ELLA MAY CARNAHAN, my nephew, FREDERICK C. McKEE and the EXECUTIVE COMMITTEE of the Board of Directors of The Union Trust Company of Pittsburgh, and the survivors and survivor thereof, shall annually determine: PROVIDED, however, that my said sister and nephew, and the survivor of them, may direct the use of a portion of the said income to alleviate distress of any of my blood relatives in the Schmertz and Carnahan families who may at the time such direction is made be in need of financial assistance.

"This trust shall be known as the MELISSA S. McKEE CARNAHAN TRUST."

Pursuant to advance distributions and a decree of distribution entered at the filing of the first and final

account of the executor, the trustee received cash and securities having a value of $633,035. Testator's sister died January 30, 1950, and thereafter the trustee received cash and securities having an inventory value of $50,274, which had previously been held in trust under the provisions of paragraph four of testator's will.

Testator's nephew, Frederick C. McKee, died March 3, 1961, and, accordingly, the trustee has now filed its first and partial account.

Mr. Carroll P. Davis, a vice president and trust officer of the trustee, wrote to testator on March 21, 1932, as follows:

"We are pleased to be informed of our appointment as Executor and Trustee under your Last Will and Testament, and in reply beg leave to advise that we will accept the appointment, administer the estate and execute the trusts in accordance with your wishes and directions, for a compensation of two (2) per cent, except that as Trustee no charge is to be made on the corpus, and the maximum charge on income is to be two (2) per cent, payable at the time other income is disbursed or invested."

Mr. Clarence Stanley, president of the trustee, confirmed this arrangement in a letter dated March 12, 1937, to testator.

At the audit of the account, the vice president of the trustee in charge of the administrative division of the trust department, testified that from the beginning of the trust, it has realized net profits of $234,460, and, in addition, as of September 5, 1961, has unrealized net profits of $330,800. Therefore, the value of the trust estate has grown from $683,309 to $1,248,567 during the period that it has been administered by the trustee.

The testimony shows that the income received by the trust in 1941 was approximately $19,000, and had increased to $31,000 in 1951. In 1955, the income had

increased to $37,400 and, in 1960, to $40,900. As a result of recent changes in investments, the projected annual gross income of the trust as of September 30, 1961, is $43,870. Even considering the $50,000 addition to the trust in 1950, the income of the trust has more than doubled during the period of administration and has increased 40 percent in the last ten years.

The testimony establishes that both administrative and investment duties have greatly increased in amount and complexity since the death of testator. All trusts are now reviewed thoroughly at least annually by a trust investment committee, of which seven senior officers of the trustee are members, and at meetings which other personnel attend for presentation and record-keeping purposes. Trusts of this size also receive briefer reviews about every three months. In addition to the general reviews of the entire investment portfolio, investment committee action is required to determine the disposition to be made of proceeds received on redemptions, the exercise or sale of stock rights, and the elections to be made on exchange of assets. Within the last three year period, 95 such decisions involving discretion had to be made by the trustee.

In addition to the investment decisions involving discretion, the trustee is required annually to clip and process approximately 882 bond coupons and to deposit and record approximately 168 dividend checks.

The testimony shows that in the last three year period the correspondence file indicated the receipt of 172 letters and the dispatch of 179. The initial responsibility for administration of this trust was placed in a trust officer who, when he had a discretionary decision to make, referred the action to the trust administrative committee for review and decision.

With respect to the payment of income to charitable institutions, the record shows it is necessary for the trust administrative committee to prepare a memoran-

dum for consideration and action by the executive committee of the board of directors.

The trustee also prepares and files income tax returns with the appropriate authorities. In connection with the preparation of the first and partial account, 275 hours were spent in compiling the account containing 88 pages.

With respect to a charitable trust which endures perpetually and concerning which no agreement relative to compensation has been made between the creator of the trust and the trustee, the testimony is that in lieu of a principal charge there is an alternative charge of seven and one-half percent of income.

It was further testified that the current rates of commission are reasonable in view of the modern methods and costs of doing business. This is in part due to the broader range and diversity of securities available in the market, modern procedure for keeping track of investments both by company and industry and to other matters such as inflation.

Where the creator of a trust and the trustee agree upon the compensation to which the trustee shall be entitled, such agreement will generally be enforced with the result that the amount of compensation provided for in the agreement will be the only compensation. This rule applies whether the compensation is set forth in the trust instrument or whether it is set forth in an agreement made outside the terms of the trust. See Hunter's O. C. Commonplace Book (2d ed.), Vol. 1, Commissions, §8(c).

However, matters relating to fiduciaries' compensation are particularly within the jurisdiction and discretion of the orphans' court. Paragraph (6) of section 301 of the Orphans' Court Act of August 10, 1951, P. L. 1163, provides that the orphans' court shall have exclusive jurisdiction of "The appointment, control,

settlement of the accounts of, removal and discharge of, and allowance to and allocation of compensation among all fiduciaries of estates and trusts of which the court has jurisdiction . . ." The court would not allow a trustee to receive an agreed compensation where it acted incompetently or negligently in the discharge of his duties. Also, where the activities or responsibilities of the trustee are increased beyond that which could be foreseen reasonably at the time the compensation agreement was made, the court has discretion to award additional compensation, particularly when the compensation provided is so inadequate that no qualified person would be willing to act as trustee and thus the purposes of the trust might be defeated or substantially impaired.

In Coleman Estate, 12 D. & C. 2d 548, there were four individual trustees and one corporate trustee serving under an agreement which fixed their compensation at three percent of the income. The corporate trustee received two percent and the four individual trustees divided the remaining one percent. An application was made to the orphans' court to increase the trustees' compensation out of income to eight percent, of which the corporate trustee was to receive four percent and the other trustees four percent. After a hearing which developed facts which are in many respects similar to those in the case at bar, the hearing judge (Taxis, P.J.) allowed future compensation out of income at the rate of six percent, three percent to the corporate trustee and three percent to the individual trustees. In support of the allowance the opinion of the court held (page 550) :

"The court possesses power to award greater compensation than that fixed by the terms of the trust where circumstances arise which were obviously not anticipated when the duties of the trustee were considered and compensation agreed upon and in circum-

stances where the duties of the trustee have become obviously more burdensome. It seems only fair and equitable that a court exercise its power to permit deviations from the terms of a compensation agreement where, owing to such change in circumstances, strict compliance with the terms of that agreement would obviously defeat or substantially impair the accomplishment of the purposes for which the trust was created. After careful consideration of all the evidence I conclude that the agreement of 1934 provides such a low rate of compensation to the trustees as to tend to defeat the very purpose of the trust to the point where a competent corporate fiduciary might with complete justification be reluctant to proceed with the trustees' duties because not adequately compensated. Cf. Restatement of the Law of Trusts, §242 f; Scott on Trusts, §242.4 pages 1937, 1938."

The attorney general has filed an able brief. On pages 6 and 7 thereof, the following is stated:

"In the case at bar, 2% is obviously inadequate. It is admitted that the cost of fiduciary services, like other costs, have increased since 1937. However, accountant has not shown unusual circumstances or gross inequities. However, the Office of the Attorney General does not accede to the request of the accountant. During the lifetime of the Settlor accountant entered into a binding agreement in perpetuity to serve as trustee for a fee which was considerably less than the then current rate of compensation. Now that Settlor and the members of his family, who would have been able to supervise the administration of this trust, are dead, the duty to uphold the agreement devolves upon the Attorney General.

"It is respectfully suggested that within the discretion of the Court some increase in compensation is justifiable. However, since the accountant agreed to serve at less than the then current rate customarily charged,

the increase in compensation should be made in the light of the agreement entered into.

"We therefore respectfully submit that the increase in compensation should be limited to reflect only the general increase in the cost of services during this period in the light of the agreement to serve for less than the customary rate."

The court takes judicial notice of the vast changes in economic conditions which have occurred since 1932. The value of the dollar has fallen by over 50 percent and the cost of doing business has increased accordingly. The evidence in the case at bar shows that since the establishment of the trust in 1939, until now, the trustee has been paid approximately $600 per year, or $50 per month, for its services. Under the care and management of the trustee the principal of the estate has increased from $683,309 to $1,248,567. The annual income of the trust has been increased from $19,000 to $43,870. These increments and the changing times over the years have imposed many duties on the trustee which could not be foreseen in 1932 and 1937. The testimony establishes that if this trust were being created now the fair and reasonable rate of compensation to be charged against the income for the services of the trustee would be seven and one-half percent, with no charge to be made against principal.

The application in the case at bar is addressed to the discretion of the court. The trustee asks that it be permitted to charge five percent of future income for services to be rendered after March 3, 1961. The attorney general of the Commonwealth does not object to a reasonable increase in compensation which will meet the trustee's costs and expenses.

The court finds and concludes that the allowance requested by the trustee is reasonable and proper in the circumstances.

A decree will be entered to accord with this opinion.